**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

PURESHARES, LLC, d/b/a PUREFUNDS
and ANDREW CHANIN,

            Plaintiffs,

    v.

PAUL ZIMNISKY,

            Defendant.

Civil Action No. 23-1178-RGA

<u>MEMORANDUM OPINION</u>

Joseph J. Longobardi, III, LONGOBARDI & BOYLE LLC, Wilmington, DE; Thomas S. Harty, HARTY LAW GROUP, PLLC, Philadelphia, PA,

    Attorneys for Plaintiffs.

Jared T. Green, R. Karl Hill, SEITZ, VAN OGTROP & GREEN, P.A., Wilmington, DE,

    Attorneys for Defendant.

February 25, 2025

**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendant's Motion to Dismiss. (D.I. 16). I have considered the parties' briefing. (D.I. 17, 19, 20, 22, 24, 25). For the reasons set forth below, the motion is GRANTED.

## I. BACKGROUND

Plaintiff PureShares, LLC, d/b/a PureFunds (hereinafter PureFunds), is a research and business management firm. (D.I. 1 at 2 ¶ 2).[1] PureFunds was formed by Plaintiff Andrew Chanin, Thomas Brown, Thomas Winston, Leigh Zimniksy, and Defendant Paul Zimnisky.[2] (*Id.* at 2 ¶ 4, 8 ¶ 26). The five original members of PureFunds executed an operating agreement (Operating Agreement I) for the company in February 2011 which governed the company's operations and the relationship of the five as owners of the company. (*Id.*). Each of the five original founders held equity in PureFunds in the form of membership units. (*Id.* at 1 ¶ 1, 2 ¶¶ 6, 14).

Operating Agreement I required a member to have majority approval should the member seek to transfer or dispose of his or her units in PureFunds. (*Id.* at 10 ¶ 36). Operating Agreement I also provided a mechanism for the members to purchase any shares that another member sought to sell. (*Id.* at 10 ¶ 39). Specifically, Operating Agreement I required a member to provide notice to the others prior to selling membership units and to give the other members a right of first refusal to purchase the units. (*Id.* at 10 ¶¶ 39–40).

On August 1, 2011, the members executed Amendment I to Operating Agreement I; the amendment removed Thomas Winston as Manager and Chief Operating Officer and terminated his interest in the 150,000 membership units he originally held. (*Id.* at 9 ¶ 30). Amendment I

---

[1] On page 8 of the Complaint, there is repeated paragraph numbering. I cite to the Complaint as (D.I. 1 at X ¶ Y), where X is the page number and Y is the paragraph number.
[2] Paul and Leigh Zimnisky are siblings.

also served to memorialize Thomas Brown's resignation as a Managing Member and the transfer of his 200,000 membership units to Thomas Brown Group, LLC, which was solely owned by Brown. (*Id.* at 9 ¶ 31). Amendment I left Andrew Chanin and Paul Zimnisky as the Managers of PureFunds. (*Id.* at 10 ¶ 38). Thomas Brown Group subsequently changed its name to Blockhouse. (*Id.* at 9 ¶ 31).

After Brown resigned as a Manager, Paul Zimnisky, Leigh Zimnisky, Andrew Chanin, and NYRV, LLC[3] entered into a new operating agreement (Operating Agreement II). (*Id.* at 9 ¶¶ 32–33). Operating Agreement II imposed the same requirements and procedures for the sale of membership units as Operating Agreement I. (*Id.* at 9 ¶ 35).

Blockhouse was terminated as a member of PureFunds for cause. (*Id.* at 6 ¶ 25). The Complaint alleges that Paul Zimnisky played a role in Blockhouse's termination. (*Id.*). Zimnisky referred to Brown in written communications with Chanin and third parties as a "problem," "mentally imbalanced," and "impractical." (*Id.* at 6 ¶ 26). Zimnisky accused Brown and his father of blackmailing Zimnisky for additional membership units in PureFunds by threatening to go to PureFunds' co-venture partner[4] with various concerns. (*Id.* at 7 ¶ 27). Zimnisky also complained about Brown to a professional colleague. (*Id.* at 7 ¶ 28).

As PureFunds struggled financially, Paul and Leigh Zimnisky eventually left. (*Id.* at 3 ¶ 6). In January 2014, Paul and Leigh Zimnisky decided to transfer their units to Chanin. (*Id.*). On January 24, 2014, Paul and Leigh Zimnisky provided notice of the transfer to the agreement's signatories, Chanin and NYRV, LLC, in accordance with Operating Agreement II. (*Id.* at 11 ¶

---

[3] The Complaint does not explain anything about NYRV, LLC.
[4] The Complaint does not identify the "co-venture partner."

46).  In February 2014, Paul Zimnisky confirmed in a message to Chanin that the withdrawal was "binding."  (*Id.* at 13 ¶ 53).

After Paul and Leigh Zimnisky left, Chanin assumed control of PureFunds as its sole Managing Member.  (*Id.* at 11–13 ¶¶ 48–50).  PureFunds raised more than $1 billion in assets under Chanin's management.  (*Id.* at 13 ¶ 51).  On August 8, 2015, Zimnisky wrote Chanin and claimed that he was still a member of PureFunds.  (*Id.* at 13 ¶ 52).  Specifically, Zimnisky argued that the transfer of his units to Chanin was of no effect because Brown did not approve of the transfer and therefore refuted its legal validity.  (*Id.*).

On August 13, 2015, Chanin sent a letter to Paul Zimnisky demanding that Zimnisky cease and desist with his claims and that he and his sister confirm the prior transfer of their units to Chanin.  (*Id.* at 4 ¶ 12).  Zimnisky did not cease and desist; he wrote PureFunds' accountant and demanded that he be re-listed as a member of the company.  (*Id.* at 4 ¶ 13).  Chanin and PureFunds then filed suit in 2015 against Paul and Leigh Zimnisky in the District of Delaware, seeking a declaratory judgment confirming Chanin's sole ownership of PureFunds.  (*Id.* at 4 ¶ 16; D.I. 14-13).

The parties to the 2015 lawsuit subsequently settled.  (D.I. 1 at 5 ¶ 17).  By signing the settlement agreement, Paul and Leigh Zimnisky reaffirmed the transfer of their ownership interests in PureFunds to Chanin and promised to execute and deliver an annexed Transfer and Assignment of Ownership Interest to Chanin.  (D.I. 14-13 § 1(i)).  Additionally, the settlement agreement committed Paul Zimnisky to appear at trial as requested to confirm certain representations made in the agreement.  (*Id.* § 1(ii)(g)).  By signing the agreement, Paul Zimnisky represented that:

> (a) Since January 24, 2014, all equitable and legal rights, [and] title to the Interests have been owned, held and exercised by Chanin;

4

(b) There were no encumbrances, liens, claims or rights on [Paul and Leigh Zimnisky's] Interests in PureFunds asserted on or before the Transfer Date other than those that may have been set forth in the Operating Agreements;

(c) On or before January 24, 2014, neither Tom Brown, nor TomBrown Group, LLC (collectively "Brown"), provided either [Paul or Leigh Zimnisky] with any written notice objecting to the transfer of the Interests to Chanin;

(d) Since January 24, 2014, neither Brown, nor any successor thereto, has provided either [Paul or Leigh Zimnisky] with any written notice objecting to the transfer of the Interest[s] to Chanin;

(e) Since January 24, 2014, [Paul and Leigh Zimnisky] have not advised Brown that the transfer to [Chanin] was invalid or violated any of the Operating Agreements previously executed by one or more of the Members; [and]

(f) [Paul and Leigh Zimnisky] advised [Chanin and PureFunds] that Brown may claim that the transfer of the Interests to Chanin on January 24, 2014 was void, of no effect, or that one or more of them had a right to all or a portion thereof (the "Brown Claim").

(*Id.* § 1(ii)). The Settlement Agreement also contained a non-disparagement clause requiring the parties "not to make statements, written or verbal, . . . that defame, disparage or in any way criticize the business reputation, practice or conduct of the other, their employees, directors and officers." (*Id.* § 8).

In March 2018, Blockhouse filed suit against Chanin and PureFunds in the Court of Chancery for the State of Delaware.[5] (D.I. 1 at 5 ¶ 20; D.I. 17-1 at 13 of 146). Paul Zimnisky was called to testify in a deposition. (D.I. 1 at 5 ¶ 20). The Complaint alleges that during his testimony, Zimnisky once again claimed an ownership interest in the units that he had transferred to Chanin. (*Id.*). When Blockhouse's counsel asked Zimnisky about the outcome of his prior

---

[5] Plaintiffs allege in their Complaint that the Blockhouse litigation commenced in March 2017. (D.I. 1 at 5 ¶ 20). According to the complaint filed in Chancery Court, the Blockhouse litigation was filed in March 2018. (D.I. 17-1 at 13 of 146). I will assume the litigation commenced in March 2018.

litigation with Chanin, Zimnisky stated that there was "never a conclusion to [his] standing as a member of the company." (*Id.* at 5 ¶ 21). He then stated that he could not have given up his equity in PureFunds because, under the governing operating agreement, members of PureFunds could not transfer units to each other without the unanimous approval of all other members. (*Id.* at 5 ¶¶ 22, 6 ¶ 24). Plaintiffs allege that Defendant's testimony is false and contradicted by both the Operating Agreement and prior actions that Zimnisky took as Manager. (*Id.* at 16 ¶ 64–66).

During his testimony, Zimnisky also stated that he could not remember the emails he had written about Brown. (*Id.* at 7 ¶ 29). When Zimnisky was shown an email that he had written, he denied knowing or remembering that the initials TB referred to Thomas Brown. (*Id.*). Zimnisky also testified that he had been defamed in the prior litigation with Chanin and PureFunds, and that Chanin threatened him and attempted to threaten his ability to work. (*Id.* at 18 ¶ 76).

On October 19, 2023, Plaintiffs Chanin and PureFunds filed this action against Paul Zimnisky, bringing five claims. (*Id.* at 1 ¶ 1). Plaintiffs claim that Zimnisky (i) breached the settlement agreement by failing to testify according to its representations, (ii) fraudulently induced Plaintiffs into signing the settlement agreement, (iii) disparaged and defamed Chanin and PureFunds, and (iv) breached the implied covenant of good faith and fair dealing. (*Id.*). Plaintiffs seek a declaratory judgment stating that Chanin holds sole, unencumbered title to the units in PureFunds transferred by Zimnisky on January 24, 2014. (*Id.*; *Id.* at 31 ¶ 153). Plaintiffs also seek specific performance of the terms of the settlement agreement and damages, including punitive damages, attorneys' fees, and costs of suit. (*Id.* at 1 ¶ 1).

## II.    LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2).  Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard.  A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").  Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III.    DISCUSSION

There is diversity jurisdiction in this case.  Plaintiff Andrew Chanin is a resident (and presumably a citizen) of New York. (*Id.* at 8 ¶ 24).  Mr. Chanin is the sole member of Plaintiff PureFunds. (D.I. 15).  Plaintiffs claim Defendant Paul Zimnisky is a resident (and presumably a citizen) of New Jersey; Defendant does not deny this. (*Id.* at 8 ¶ 25).  There is thus diversity of

citizenship. 28 U.S.C. § 1332(a)(1). Plaintiffs allege their damages exceed the statutory minimum, $75,000. (*Id.* at 8 ¶ 32). Defendant does not counter this. The amount in controversy requirement is met. 28 U.S.C. § 1332(a).

Defendant contends that all Counts of the Complaint should be dismissed for failure to state a claim. (D.I. 17 at 9). After reviewing the briefing, I issued an order to show cause, requesting Plaintiffs to show why their claims should not be dismissed for judicial immunity or the statute of limitations. (D.I. 21). Both sides submitted supplemental briefing. (D.I. 22, 24, 25).

### A. Breach of Settlement Agreement

Under Delaware law, the elements for a breach of contract claim are "(1) a contractual obligation; (2) a breach of that obligation by the defendant; and (3) resulting damage to the plaintiffs."[6] *Greenstar, LLC v. Heller*, 814 F. Supp. 2d 444, 450 (D. Del. 2011).

Defendant argues Plaintiffs have not alleged facts sufficient to make out a claim for breach of the Settlement Agreement. (D.I. 17 at 9 of 13). Defendant further argues that Plaintiffs have not properly alleged damages. (*Id.*).

Plaintiffs allege that Defendant breached § 1(ii)(g) of the Settlement Agreement, which required Defendant to testify according to the representations he made in § 1(ii)(a–e) of the Agreement.[7] (D.I. 1 at 20 ¶ 87, 21 ¶ 95). These representations included, "Since January 24, 2014, all equitable and legal rights, [and] title to the Interests have been owned, held and exercised by Chanin." (D.I. 14-13 § 1(ii)(a)). Plaintiffs allege that Defendant breached by

---

[6] The first element is not in dispute. Neither side disputes that the Settlement Agreement is a valid contract. (D.I. 17 at 9–10 of 13; D.I. 19 at 14–16 of 22).

[7] Plaintiffs also contend that the parties agreed to a non-disparagement and anti-defamation clause, and that Defendant breached this clause. I discuss whether Plaintiffs sufficiently pled breach of the non-disparagement clause when I discuss Count III of the Complaint.

claiming an ownership interest in PureFunds during Defendant's deposition in the Blockhouse litigation. (D.I. 1 at 21 ¶ 92). Plaintiffs point to Defendant's deposition testimony that "there was never a conclusion to [Defendant's] standing as a member of the company," that "members of PureFunds could not transfer units to each other without [the] unanimous approval of all other members," and that "[Defendant] could not give up the 'equity' in [Defendant's] PureFunds under the governing Operating Agreement." (*Id.* at 21 ¶¶ 93–94, 96).

Defendant contends he did not breach because he did not claim an ownership interest in PureFunds during his deposition. (D.I. 17 at 6 of 13). Defendant argues that Plaintiffs take Defendant's deposition testimony out of context and that all of Defendant's testimony was truthful. (*Id.* at 6–7 of 13). Defendant explains that when he stated "there was never a conclusion to [his] standing as a member of [PureFunds]" in his deposition, he meant that the prior lawsuit did not result in any "formal, judicial determination" of Defendant's ownership status. (*Id.* at 7 of 13). Defendant also argues that, because the deposition was cut short but not formally ended, Defendant cannot have breached § 1(ii)(g) of the Settlement Agreement because "he has not finished his testimony." (*Id.* at 10 of 17). Finally, Defendant argues that Plaintiffs failed to respond to any of his arguments and therefore Plaintiffs' claim for breach of the Settlement Agreement should be waived. (D.I. 20 at 2).

Plaintiffs argue Defendant is not immune from liability under the litigation privilege, citing a Delaware Superior Court case discussing a potential "sham litigation" exception of litigation privilege. (D.I. 22 at 10 of 14 (citing *Nix v. Sawyer*, 466 A.2d 407 (Del. Super. Ct. 1983))). Plaintiffs essentially argue a similar exception should apply here, because Defendant's testimony "was knowingly and intentionally false and tantamount to the prosecution of a

malicious action." (*Id.* at 10–11 of 14).  Plaintiffs cite law from other jurisdictions to support applying a "sham litigation exception" to the litigation privilege.  (*Id.* at 11–12 of 14).

Defendant argues that he is immune from liability under the litigation privilege, even if his deposition testimony was intentionally false and malicious.  (D.I. 24 at 2).  Defendant argues the cases cited by Plaintiffs are inapposite because they were based on malicious prosecution by a party, while Defendant was a witness to the Blockhouse litigation, not a party.  (*Id.* at 3–4).

I think judicial immunity warrants dismissal of Count I.  "Absolute immunity from civil suit for testimony provided in judicial proceedings is an English common law rule adopted throughout this country." *Dollard v. Callery*, 185 A.3d 694, 711 (Del. Super. Ct. 2018) (citing *Briscoe v. LaHue*, 460 U.S. 325, 330–31 (1983)).  The immunity applies "even if the witness's statement was false and malicious." *Id.*

Plaintiffs do not dispute that Defendant's deposition testimony may qualify for judicial immunity.  (D.I. 22 at 10 of 14).  Plaintiffs allege an exception akin to malicious prosecution should apply here.  (*Id.* at 10–11 of 14).  In the case cited by Plaintiffs, the court did not say there was, in fact, a "sham litigation" exception in Delaware; the Delaware Supreme Court later rejected such an exception. *Nix*, 466 A.2d at 411; *Barker v. Huang*, 610 A.2d 1341, 1345 (Del. 1992).  Indeed, in the case cited by Plaintiffs, the court emphasized that "the interest in encouraging a litigant's unqualified candor as it facilitates the search for truth is deemed so compelling that the privilege attaches even where the statements are offered maliciously or with knowledge of their falsity." *Nix*, 466 A.2d at 411.

While the litigation privilege as applied to tort defamation claims seems to be widely understood in Delaware, less certain is the privilege applied to breach of contract claims.

10

Several Delaware courts have recently considered the relationship between the litigation privilege and breach of contract claims.

In 2019, the Court of Chancery held, "[T]he absolute litigation privilege prohibits (at least) the equitable prohibition of litigation-related utterances, under the rubric of a contractual non-disparagement clause." *Ritchie CT Opps, LLC v. Huizenga Managers Fund, LLC*, 2019 WL 2319284, at *14 (Del. Ch. May 30, 2019). The court reasoned that an injunction in such a scenario "would impermissibly chill the pursuit of justice via litigation no less so than permitting analog tort claims in the litigation context." *Id.*

A year later, the Court of Chancery applied "the absolute litigation privilege to a contractual damages claim," also a non-disparagement clause, explaining that "the policy underlying the absolute litigation privilege compels the conclusion that it applies to claims arising in contract as well as in tort." *Sheehan v. AssuredPartners, Inc.*, 2020 WL 2838575, at *16–17 (Del. Ch. May 29, 2020). The court reasoned that a ruling to the contrary could chill litigation and "the application of the non-disparagement clause to the statements in litigation has potentially never-ending implications," like the ceaseless spawning of new claims throughout litigation. *Id.* at *17.

After *Ritchie* and *Sheehan*, the Superior Court refused to dismiss contract claims under the litigation privilege, distinguishing the two earlier cases, because the breach of contract claims at issue were "not simply recast tort claims" and were based on a pre-litigation, "one-off event." *Feenix Payment Sys., LLC v. Blum*, 2022 WL 215026, at *7–8 (Del. Super. Ct. Jan. 25, 2022).

Most recently, the Court of Chancery declined to apply the litigation privilege to a breach of contract claim, because dismissal would have voided a repurchase option that was triggered by a violation of a non-disparagement clause, reasoning that "Delaware law provides for

11

maximum freedom in allowing parties to order their governance arrangements" and "[t]he specter of potentially chilling litigation by enforcing the [r]epurchase [o]ption is far weaker in comparison to the facts in *Sheehan* and *Ritchie*." *Seva Holdings Inc. v. Octo Platform Equity Holdings, LLC*, 2024 WL 3982187, at *8 (Del. Ch. Aug. 29, 2024). Notably, "the [r]epurchase [o]ption itself does not prevent . . . litigation" because the party can continue litigating "without fear of incurring tort or non-disparagement-based liability for the statements." *Id.*

I think this case is most like *Ritchie* and *Sheehan*. This is not like *Feenix* where the defendant was sued for breach of contract for a statement made prior to litigation. *Feenix*, 2022 WL 215026, at *8. Nor is this case like *Seva*, where dismissing a breach of contract claim under the litigation privilege would result in the unravelling of carefully negotiated repurchase agreement between two companies. *Seva*, 2024 WL 3982187, at *8. Allowing the breach of contract claim to proceed here could "impermissibly chill the pursuit of justice" and not encourage litigants' "unqualified candor" in "the search for truth." *Ritchie*, 2019 WL 2319284, at *12, *14. Delaware courts even apply the privilege to malicious and false statements. *Id.* at *12. Allowing the breach of contract claim to proceed, which is based solely on Defendant's deposition testimony, could inhibit unqualified candor in litigation, the type of consequences Delaware courts seek to avoid when applying the litigation privilege. *See Sheehan*, 2020 WL 2838575, at *16–17.

Count I is dismissed.

## B. Fraudulent Inducement

Defendant argues that Plaintiffs fail to state a claim for Count II, fraudulent inducement, because Plaintiffs "bootstrap" their breach of contract claim into its fraudulent inducement claim.

12

(D.I. 17 at 10).  Defendant cites *Cornell Glasgow, LLC v. La Grange Props., LLC* for the proposition:

> Delaware courts will not permit a plaintiff to bootstrap a breach of contract claim into a tort claim merely by intoning the prima facie elements of the tort while telling the story of the defendant's failure to perform under the contract.  To be viable, the tort claim must involve violation of a duty which arises by operation of law and not by the mere agreement of the parties.

2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012).  Defendants contend that the "story told" in the Complaint for the fraudulent inducement is nearly identical to that told for the breach of contract claim; namely, that Defendant did not meet Defendant's contractual obligations at his deposition.  (D.I. 17 at 11 of 13).

Plaintiffs contend that they have made out a fraudulent inducement claim.  (D.I. 19 at 16 of 22).  Plaintiffs cite *Abry Partners V, L.P. v. F & W Acquisition LLC* for the proposition that, in order to establish a claim for fraudulent inducement under Delaware law, a plaintiff must allege:

> (1) [T]he defendant falsely represented or omitted facts that the defendant had a duty to disclose; (2) the defendant knew or believed that the representation was false or made the representation with a reckless indifference to the truth; (3) the defendant intended to induce the plaintiff to act or refrain from acting; (4) the plaintiff acted in justifiable reliance on the representation; and (5) the plaintiff was injured by its reliance.

891 A.2d 1032, 1050 (Del. Ch. 2006).

Plaintiffs argue that they have stated a claim for fraudulent inducement because Defendant made multiple false representations in violation of the Settlement Agreement.  (D.I. 19 at 16–19 of 33).  Plaintiffs contend that these false representations include that Defendant "feigned ignorance" and pretended that he could not remember his prior negative communications about Brown, and that Defendant lied during his testimony about the process for and possibility of transferring membership units.  (D.I. 19 at 15 of 22; D.I. 1 at 25 ¶ 116–118, 26 ¶ 124).

13

Plaintiffs argue their claim is not barred by the statute of limitations. (D.I. 22 at 12 of 14). In Delaware, fraudulent inducement claims must be filed within three years of accrual. DEL. CODE tit. 10, § 8106(a). The federal case was dismissed on November 30, 2016; the Settlement Agreement must have been signed by then, at the latest. (Docket No. 15-820, D.I. 15). Plaintiffs filed this action on October 19, 2023, nearly seven years later. (D.I. 1). Plaintiffs argue the cause of action accrued not when the Settlement Agreement was signed, but when Defendant's deposition was completed (on October 26, 2020), because Plaintiffs had no reason to suspect Defendant was making false representations until his deposition. (D.I. 22 at 13 of 14; 17-2 at 2 of 34). Plaintiffs argue that the statute of limitations should be tolled because they were unable to discover the fraud until Defendant's deposition. (D.I. 22 at 13 of 14).

Defendant argues the fraudulent inducement claim is barred by the statute of limitations. (D.I. 24 at 4). Defendant argues the cause of action accrued when the Blockhouse litigation commenced on March 20, 2018 because Plaintiffs were on inquiry notice of Defendant's testimony, and thus the cause of action expired on March 20, 2021. (*Id.* at 5). Defendant argues tolling should not apply here because Plaintiffs cannot show Defendant "acted in an affirmative manner to conceal the cause of action." (*Id.*).

"A claim for fraudulent inducement accrues when the fraudulent statements were made, which must be on or before the date when the parties entered into the contract." *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Ct. Dec. 29, 2015). Courts can "toll the statute of limitations when the facts underlying a claim were so hidden that they could not have been discovered by a reasonable plaintiff." *Id.* at *5. "For tolling to apply, [Plaintiffs] must plead that (i) [Defendant] acted in an affirmative manner to conceal the cause of action from Plaintiffs and (ii) [Defendant] knew about the alleged wrong to

14

toll the statute of limitations at this motion to dismiss." *Techview Invs. Ltd. v. Amstar Pol. Prop. Fund I, L.P.*, 2021 WL 3891573, at *9 (Del. Super. Ct. Aug. 31, 2021). If tolling applies, then the statute of limitations period begins to run when the plaintiff is on inquiry notice of the fraud. *Id.*

The Settlement Agreement was finalized, at the latest, on the day the federal case was dismissed, November 30, 2016. (Docket No. 15-820, D.I. 15). That is the latest a claim for fraudulent inducement could have accrued. *Pivotal Payments*, 2015 WL 11120934, at *4. Plaintiffs allege tolling should apply, but they offer no support to show that the facts supporting a claim for fraud "were so hidden that they could not have been discovered by a reasonable plaintiff." *Id.* at *5. Plaintiffs allege they "had no reason to suspect [the] falsity of [Defendant's] representations in the Settlement Agreement" (D.I. 22 at 13 of 14), but make no showing that Defendant affirmatively acted to conceal the fraud. I do not think tolling is appropriate here.

Count II is dismissed because it is barred by the statute of limitations.

Even if Count II is not barred by the statute of limitations, Plaintiffs have not stated a claim for fraudulent representation.[8] "[O]ne cannot 'bootstrap' a claim of breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations." *Iotex Commc'ns, Inc. v. Defries*, 1998 WL 914265, at *4 (Del. Ch. Dec. 21, 1998); *see also Narrowstep, Inc. v. Onstream Media Corp.*, 2010 WL 5422405, at *15 (Del. Ch. Dec. 22, 2010) ("[C]ouching an alleged failure to comply with a contract as a failure to disclose an intention to take certain actions arguably inconsistent with that contract is 'exactly the type of bootstrapping this Court will not entertain.'").

---

[8] Defendant also argues that Plaintiffs have waived any opposition to Defendant's bootstrapping argument because Plaintiffs did not address it. (D.I. 20 at 3). I do not address this argument as I find on the merits that Plaintiffs have not stated a claim for fraudulent inducement.

Plaintiffs allege in their Complaint that Defendant spoke poorly of Brown in various emails and communications, denied doing so, and gave testimony at his deposition in the Blockhouse litigation that contradicted the representations he had agreed to make under the Settlement Agreement. (D.I. 1 at 24–28 ¶¶ 112–138). These are the same allegations Plaintiffs made for their breach of contract claim. (D.I. 1 at 19–24 ¶¶ 81–111). *See Narrowstep*, 2010 WL 5422405, at *15 (requiring more than "a mere intention not to comply with the terms of the Agreement" to deny a motion to dismiss for fraud).

In other words, I agree with Defendant that Plaintiffs have only told "the story of . . . [D]efendant's failure to perform under the contract" in their Complaint. *Cornell Glasgow,* 2012 WL 2106945, at *8. The Settlement Agreement is the source of Plaintiff's claim, which is insufficient to plead a claim for fraudulent inducement. I think that Count II is a "mere bootstrap" of Count I, Breach of Settlement Agreement. *Narrowstep*, 2010 WL 5422405, at *15.

## C. Disparagement and Defamation

Count III of Plaintiffs' Complaint is titled "Disparagement and Defamation." (D.I. 1 at 29). The parties disagree about what type of action is pled in Count III. Defendant's arguments make clear that Defendant views Count III as a tort claim for defamation. (D.I. 17 at 11 of 13). Defendant argues that Plaintiffs are impermissibly bootstrapping a breach of contract claim as a tort claim for defamation. (*Id.*). Defendant also argues that Plaintiffs fail to allege that Defendant made any defamatory statements. (*Id.* at 12 of 13). Defendant contends in the alternative that if Plaintiffs do state a claim for defamation that is different than a breach of contract claim, then the defamation claim is time-barred. (*Id.*).

Plaintiffs argue that the Settlement Agreement included a non-disparagement and non-defamation clause, which Defendant breached. (D.I. 19 at 20 of 22). Plaintiffs' argument makes

clear they view Count III as a breach of contract claim for the breach of the non-disparagement and defamation clause. The Complaint also makes clear that Count III is a breach of contract claim, and I treat it as such.

Count III of the Complaint alleges, "A material provision of the Settlement Agreement was a non-disparagement and non-defamation clause." (D.I. 1 at 29 ¶ 140).

The Non-Disparagement Clause states that:

> The parties agree not to make any statements, written or verbal, or cause or encourage others to make any statements, written or verbal, that *defame, disparage or in any other way criticize the business reputation, practice or conduct* of the other, their employees, directors and officers. The Parties acknowledge and agree that this prohibition extends to statements, written or verbal, made to any person or any entity. The Parties further acknowledge and agree that any breach of this provision is a material breach of this Agreement and would irreparably harm the non-breaching Party or Parties.

(*Id.* at 29 ¶ 141) (emphasis added).

Plaintiffs allege that Defendant's deposition testimony was false and breached the above provision of the Settlement Agreement. Plaintiffs specifically allege the following testimony violated the Non-Disparagement Clause: that there was "never a conclusion to [Defendant's] standing as a member of the company," that Defendant could not give up his equity in PureFunds under the Operating Agreement, that Defendant had been defamed in the prior litigation, and that Chanin threatened Defendant and Defendant's ability to work. (*Id.* at 29–30 ¶¶ 143–44).

The parties offer the same litigation privilege arguments they offered for Count I. For the same reasons I state with respect to Count I, I think the litigation privilege warrants dismissal of Count III. Indeed, *Sheehan* makes clear that the litigation privilege warrants dismissal of breach of contract claims alleging a breach of a non-disparagement clause. *See Sheehan*, 2020 WL 2838575, at *16–17.

Count III is dismissed.

17

## D. Declaratory Judgment

Plaintiffs seek a declaratory judgment that Plaintiff Chanin is the sole and exclusive owner of the membership units that Defendant transferred to him on January 24, 2014. (D.I. 1 at 31 ¶ 153). Defendant argues that Plaintiffs' declaratory judgment claim should be dismissed as moot. (D.I. 17 at 12 of 13). Defendant contends that he has never challenged the terms of the Settlement or that Chanin is the sole member of PureFunds. (*Id.*). Plaintiffs do not respond to Defendant's argument in their answering brief, and Defendant does not expand on its argument in its reply brief.

The Declaratory Judgment Act provides, "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201(a). Courts have discretion to dismiss a declaratory judgment claim when issuing a declaratory judgment would serve no useful purpose. *Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 560 (3d Cir. 1997). For a declaratory judgment action to be a live case or controversy, the dispute must be "definite and concrete, touching the legal relations of parties having adverse legal interests," as well as "real and substantial" and "admit of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (internal quotation marks and alterations omitted). The Supreme Court summarized: "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.*

I decline to exercise jurisdiction over Plaintiffs' declaratory judgment claim. I do not think there is an actual, concrete controversy that warrants a declaratory judgment. Plaintiffs want a ruling that Chanin is the sole owner of the PureFunds shares transferred to him by Defendant. (D.I. 1 at 31 ¶ 153). Plaintiffs point to Defendant's deposition testimony, where he says there was "never a conclusion to [Defendant's] standing as a member of [PureFunds]" and that, under the Operating Agreement, Defendant "could not give up [his] 'equity.'" (*Id.* at 16 ¶¶ 62–63). In his deposition, Defendant explained that his lawyer "prepared" the Settlement Agreement and that Defendant then signed it. (D.I. 17-2 at 116:8–16). Defendant repeatedly said signing the Settlement Agreement was his "only option" and would not say that the statements made in the Settlement Agreement were true. (*See id.* at 118:12, 118:24–119:1, 119:16–18, 120:10–11, 123:3–7, 123:19–24). Defendant also did not say the statements in the Settlement Agreement were false. Defendant has not indicated, in his deposition testimony or otherwise, that he thinks he owns parts of Plaintiff Chanin's interests in PureFunds. An opinion on the ownership of the shares would be an impermissible "opinion advising what the law would be upon a hypothetical state of facts." *MedImmune*, 549 U.S. at 127.

Count IV is dismissed.

### E. Breach of the Implied Covenant of Good Faith

In Count V of their Complaint, Plaintiffs plead breach of the implied covenant of good faith. (D.I. 1 at 36 ¶ 174). Defendant argues I should dismiss Count V because such a claim is "extreme," and Plaintiffs failed to state a claim because they do not allege anything beyond what is covered by the contract. (D.I. 17 at 12–13 of 13). Plaintiffs argue that they have sufficiently pleaded the three elements of breach of the implied covenant of good faith. (D.I. 19 at 21 of 22).

"Delaware courts have consistently held that obligations based on the covenant of good faith and fair dealing should be implied only in rare instances." *TL of Fla., Inc. v. Terex Corp.*, 54 F. Supp. 3d 320, 329 (D. Del. 2014). "[T]he implied covenant does not apply when the contract addresses the conduct at issue, but only when the contract is truly silent concerning the matter at hand." *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 507 (Del. 2019) (internal quotations omitted); *see also Rheault v. Halma Holdings Inc.*, 2023 WL 8005318, at *13 (D. Del. Nov. 7, 2023) (dismissing a claim for breach of the implied covenant of good faith and fair dealing "as impermissibly duplicative of [the] breach claim[]" because it was "based on the same conduct" and "factual bases" as the breach claim). To state a claim for breach of the implied covenant of good faith and fair dealing, Plaintiff "must allege a specific implied contractual obligation, a breach of that obligation by the defendant, and resulting damage to the plaintiff." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009).

Defendant argues that Plaintiffs did not make out a claim for breach of the implied covenant of good faith because Plaintiffs' claim is that Defendant breached the "express terms of the Settlement Agreement." (D.I. 1 at 36 ¶¶ ¶ 171-72). Defendant contends that Plaintiffs merely reassert their breach of contract claim which cannot support a claim for breach of the implied covenant of good faith. (D.I. 17 at 13).

Plaintiffs contend that they have adequately pled Defendant's bad faith in the negotiation and performance of the Settlement Agreement. (D.I. 19 at 21). Plaintiffs provide no other argument. (*Id.*).

The parties offer the same litigation privilege arguments they offered for Count I. I think that Count V should be dismissed based on litigation privilege. These allegations arise out of the

Settlement Agreement and are based solely on Defendant's deposition testimony in the Blockhouse litigation. I think that triggers the litigation privilege. *See Sheehan*, 2020 WL 2838575, at *16 ("[T]he policy underlying the absolute litigation privilege compels the conclusion that it applies to claims arising in contract as well as in tort.").[9] Plaintiffs allege the exact same conduct for Count V that they allege for Count I. For the same reasons I explain with respect to litigation privilege for Count I, Count V is dismissed.

Even if the litigation privilege does not warrant dismissal of Count V, I agree with Defendant that Plaintiffs base their claim only on the express terms of the Settlement Agreement. Plaintiffs allege that Defendant transferred his units to Chanin and later contested the transfer. (D.I 1 at 32–34 ¶¶ 157–162). Plaintiffs allege that Plaintiffs sued Defendant and Defendant entered into the Settlement Agreement to resolve the litigation. (*Id.* at 35–36 ¶¶ 166–171). Plaintiffs allege that Defendant breached the Agreement and only entered it to fraudulently secure dismissal of the prior litigation. (*Id.* at 36 ¶ 172). Plaintiffs allege nothing that was not already alleged in their Count I. The "contract addresses the conduct at issue," *Oxbow*, 202 A.3d at 507, which warrants dismissal of Count V.

## IV.    CONCLUSION

An appropriate order will issue.

---

[9] I note that, in *Sheehan*, the court declined to dismiss an implied covenant claim. *Sheehan*, 2020 WL 2838575, at *11. That claim, however, was based on improper termination, not any litigation-related conduct or statements. *Id.*